UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DELTA RESEARCH CORPORATION, a Michigan corporation,
        Plaintiff,

v.

EMS, INC., an Ohio corporation, DAVID MOORE, an individual, and S.K. RIGGING CO., INC., an Ohio corporation, jointly and severally,

        Defendants.
_____/

CASE NO. 04-60046

HON. MARIANNE O. BATTANI

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Before the Court are Plaintiff Delta Research Corporation's Motion for Summary judgment against EMS, Inc. (Doc. # 37) and EMS, Inc.'s Motion for Summary Judgment against Plaintiff (Doc. # 41).

The Court heard oral argument on April 25, 2005. At the conclusion of the hearing, the Court took the matter under advisement.[1] For the reasons stated below, the Court GRANTS in part and DENIES in part Plaintiff's Motion for Summary Judgment and GRANTS in part and DENIES in part EMS, Inc.'s Motion for Summary Judgment.

**I. STATEMENT OF FACTS**

Plaintiff, Delta Research Corp. (Delta), is a tool and die company. In October 2003, it purchased a used G&L Boring Machine (the "boring mill") for $250,000, at a liquidation sale in Cincinnati, Ohio. According to Plaintiff, this type of machinery typically is available

---

[1] Cross-motions for summary judgment by Defendant S.K. Riggings Co. and Plaintiff were also argued. The Court resolves those motions by separate opinion and order.

new, and only by custom order. Delta planned to use the machine to provide goods to International Machine Service, Inc. and they entered into a $291,600 contract. See Pl.'s Ex. B. The contract included a profit margin of 26%, or $75,816. Pl.'s Ex. I.

Delta contracted with Defendant, S.K. Rigging Co. (S.K. Rigging), to load and transport the boring mill from Cincinnati to Delta's principal place of business in Livonia, Michigan. Pl.'s Ex. C. Delta insured the boring mill for the amount of the purchase price.

S.K. Rigging hired Defendant, EMS, Inc. (EMS), to supply a flatbed semi-trailer and cab and drive the mill to Livonia. After the boring mill, which was an oversized load, was placed on the trailer, Defendant David Moore measured the vertical clearance. See Def.'s Ex. 2. EMS President and CEO, Mack Fee, also measured the vertical clearance. Id. The two agreed that the vertical clearance was 13'10". Id. Moore then called the measurements to his dispatcher, Ed Bedel, who forwarded them to the Michigan Department of Transportation (MDOT).

MDOT issued a special transportation moving permit. Def.'s Ex. 4. Among other things, the permit required that the "route be checked for vertical clearance and overhead obstructions prior to movement." (Special Condition 2); and advised that caution be used at "all overhead obstructions" (Special Condition 16). Id. The restrictions did not require the company to provide an escort vehicle to check the vertical clearance of each overpass.

Moore drove the truck on behalf of Defendant EMS. As Moore prepared to exit the freeway, the top of the boring mill struck the Farmington Road exit sign, causing the sign to detach from the bridge. The equipment was destroyed. EMS asserts that the sign was hung within the posted vertical clearance. It is undisputed that the truck passed under two overpasses in proximity to the site of the accident, marked with clearances of 14' and 14'4", respectively. The sign at the site of the accident indicated a clearance of 14'3". See Def.'s Exs. 8, 9.

Delta subsequently sought a replacement machine, but was unable to purchase one. Consequently, Plaintiff was forced to cancel its agreement with International Machine Services, Inc. See Pl.'s Exs. I and J.

Thereafter, Plaintiff filed its two count complaint, alleging a violation of the Carmack Amendment to the Interstate Commerce Act, 49 U.S.C. § 14706 (Count I), and a claim of

negligence (Count II).  See First Amended Complaint.  Plaintiff moves for summary judgment on EMS's liability pursuant to Count I and on the amount of damages.  EMS moves for summary judgment on both counts of the First Amended Complaint and, in the alternative, asks the Court to limit Plaintiff's damages to the purchase price of the mill.

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) authorizes the Court to grant summary judgment "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  There is no genuine issue of material fact if there is no factual dispute that could affect the legal outcome on the issue.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).  In other words, the movant must show he would prevail on the issue even if all factual disputes are conceded to the non-movant.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

In assessing cross-motions for summary judgment, each movant must individually fulfill the requirements articulated in Rule 56.  The court is not required to grant summary judgment as a matter of law for either side; rather, the court evaluates each motion on its merits.

## III. ANALYSIS

The cross-motions for summary judgment raise three issues:  the availability of a defense to liability under the Carmack Amendment; the viability of Plaintiff's negligence claim; and the limits on damages available under the Carmack Amendment.  The Court turns its attention to the Carmack Amendment, which governs the liability of a carrier as well as the availability of a defense to liability.

### A. The Carmack Amendment

The Carmack Amendment governs liability for loss, damage, or injury to property transported in interstate commerce.  See 49 U.S.C. § 14706; Adams Express Co. v. Croninger, 226 U.S. 491, 505 (1913); Read-Rite Corp. v. Burlington Air Express, Ltd., 186

F.3d 1190, 1196 (9th Cir.1999).  Under the Carmack Amendment "in an action to recover from a carrier for damage to a shipment, the shipper establishes his prima facie case when he shows delivery in good condition, arrival in damaged condition, and the amount of damages."  Missouri Pac. R. Co. v. Elmore & Stahl, 377 U.S. 134, 138 (1964).  Once a shipper has stated a prima facie case against a common carrier, the burden of proof shifts to "the carrier to show both that it was free from negligence and that the damage to the cargo was due to one of the excepted causes relieving the carrier of liability."  Id.  Five "excepted causes" relieve a carrier from liability in the absence of its own negligence, namely: "(a) the act of God; (b) the public enemy; (c) the act of the shipper himself; (d) public authority; or (e) the inherent vice or nature of the goods."  Id. (internal quotation marks omitted).  The statute codifies the common-law rule that a carrier, though not an absolute insurer, is liable for damage to goods transported by it, unless it can show that the damage was caused by interference by human forces, not under the control of either the shipper or carrier.  Declarations of martial law, embargos, quarantine restrictions, strikes and riots fall within the enumerated exceptions.

  EMS asserts that it was free from negligence:  the vertical clearance sign posted at the site of the accident was either improperly marked or improperly placed.  Under either explanation, EMS concludes that the accident was the result of MDOT and, therefore, falls within the public authority exception.  The Court disagrees.

  EMS is correct that MDOT has jurisdiction over the highway and that it has a duty to maintain the highway in reasonable repair, keeping it reasonably safe and convenient for public travel.  See Mich.Comp.Laws § 691.1402.  EMS' argument may support its own lack of negligence, but it fails to establish that it falls within scope of the public authority exception,  MDOT's placement of the sign is not analogous to the types of conduct deemed by courts to fall within the public authority exception.

  Although cases raising the public authority defense are antiquated, the facts typically include active intervention by a public authority and a situation beyond the knowledge or control of the carrier.  For example, in Boyd v. King, 201 Mich. 436, 167 N.W. 901 (1918), cert. denied, 248 U.S. 572 (1918), although the government had imposed a quarantine on livestock, the carrier accepted a shipment of livestock.  Because of the carrier's knowledge

of the possibility that the shipment would be subject to the quarantine, the court held that the public authority defense was not available to it. In another case in which the exception was raised, <u>Chicago & EIR v. Collins Produce Co.</u>, 249 U.S. 186 (1919), the carrier was unable to deliver its cargo because the military seized it. At issue was whether the seizure was by invitation or confiscation. The Court noted that in the event that the cargo was offered to the military, the defense did not apply. The court was concerned, in particular, about collusion between carriers resulting in unaccountable losses of cargo in transit.

EMS, who bears the burden to show the applicability of the exception, has not cited a single case wherein a carrier was relieved of liability under the Carmack Amendment based upon the malfeasance or nonfeasance of the governmental agency charged with the duty to maintain the roads. Its situation is not analogous to situations involving active intervention in or prevention of delivery by the government, such as embargos, loss of cargo through the legal process and declaration of martial law.

In addition, EMS cannot show a situation beyond its knowledge or control, as a matter of law, given the language contained in the permit itself. It reads in relevant part, "The granting of a permit shall not be considered as a guarantee of the sufficiency of a highway; highway width or vertical clearance; or highway structure for transporting on the route." <u>See</u> Pl.'s Ex. D, Item P. The permit adds that "the permittee certifies that he has checked the route as necessary for vertical clearances and overhead obstructions prior to any movement. Striking or damage to any structure or facility will be perceived to be noncompliance with this section and will result in termination of this permit." <u>Id.</u> Item S. Finally, the permit indicates, "The permittee shall be responsible for damages to the highway, to person, and property caused by or arising from operations covered by this permit. The permittee shall indemnify and save harmless the Transportation Commission, the department and all of their employees from any and all suits, claims, and damages for every kind arising out of, under, or by reason of this permit, or from operations covered by this permit." <u>Id.</u> , Item T. The alleged negligence of MDOT does not necessarily relieve EMS of liability to Plaintiff. EMS had ample notice that the selected route was not guaranteed to be adequate for vertical clearance of the boring mill. Accordingly, the Court denies EMS' request for summary judgment on its contention that the public authority

defense exempts it from liability. Further, given EMS' failure to establish a viable defense, the Court grants Plaintiff summary judgment as to EMS' liability.

### B. Negligence

The next issue raised in the cross-motions for summary judgment is whether Count II, a state law claim of negligence, fails as a matter of law as to EMS. Here, the law is clear. The Carmack Amendment preempts state regulation of carrier liability. Adams Express Co. v. Croninger, 226 U.S. 491, 505 (1913); Read-Rite Corp. v. Burlington Air Express, Ltd., 186 F.3d 1190, 1196 (9th Cir.1999) (The Carmack Amendment was enacted to achieve uniformity and "supersede all state regulation with reference to liability for lost or damaged property."). Preemption applies against any tort action "where the subject matter of the action is related to the carrier's prices, routes, or services." Deerskin Trading Post, Inc. v. United Parcel Serv. Of Am. Inc., 972 F.Supp. 665 (N.D.Ga.1997).

Without question, in this case, Delta's cause of action against EMS relates to the "price, route or service" provided by EMS. Plaintiff concedes that its negligence claim is only available if the Carmack Amendment is not applicable. It is. Accordingly, the Court grants EMS summary judgment on Count II of the First Amended Complaint.

### C. Damages

Despite the seemingly straightforward language in the statute, the parties contest the types of damages available to Plaintiff on its Carmack Amendment claim. EMS's argues that Plaintiff's recovery is limited to the purchase price of the mill, less salvage and other expenses, and observes that there is no provision in the Act for replacement costs. In contrast, Plaintiff contends that only the replacement cost will adequately compensate it for its actual loss and that it is entitled to consequential damages.

The Carmack Amendment states that it subjects a carrier to "liability. . .for the actual loss or injury to the property." 49 U.S.C. § 14706. See also Contempo Metal Furniture Co. v. East Texas Motor Freight Lines, Inc., 661 F .2d 761, 764 (9th Cir.1981) (noting that under the Carmack Amendment, the common law rule that special or consequential damages are not usually recoverable from a motor carrier has not been altered). Despite

the limiting language of the statute, the Supreme Court "from its earliest interpretation has consistently construed the Amendment" as allowing much more. Air Prods. & Chems., Inc. v. Illinois Cent. Gulf R.R. Co., 721 F.2d 483, 485 (5th Cir. 1983). In addressing the availability of damages, the Supreme Court wrote that the Carmack Amendment is "comprehensive enough to embrace all damages resulting from any failure to discharge a carrier's duty with respect to any part of the transportation to the agreed destination." Southeastern Express Co. v. Pastime Amusement Co., 299 U.S. 28, 29 (1936). Courts have allowed recovery for lost profits unless too speculative, Canar Corp. v. Preston Trucking Co., 221 F.3d 271, 277 (1st Cir. 2000), as well as reasonably foreseeable consequential damages, Air Prods., 721 F.2d at 485.

The general rule for determining the amount of damages is that "actual loss" equals the difference between the market value of the property in the condition in which it should have arrived at its destination, and its market value and the condition in which it did arrive. Id.; see also Gordon v. United Van Lines, Inc., 130 F.3d 282, 287-88 (7th Cir. 1997) ("actual loss" is usually measured by the market value of the goods at destination). The general rule invoked for recovery assumes that replacement costs are usually inadequate for a plaintiff, because recovering replacement costs "deprive[s] a manufacturer of expected profit which he is on the verge of earning and do[es] not compensate him for what he would have had if the contract had been performed." Polaroid Corp. v. Schuster's Express, Inc., 484 F.2d 349, 351 (1st Cir. 1973).

In Illinois Cent. R.R. Co. v. Crail, 281 U.S. 57, 64-65 (1930), however, the Supreme Court acknowledged that the replacement cost can be an appropriate measure of damages, when the typical measure of the difference between the market value of the property if it had been delivered according to the contract specifications, and the market value of the non-conforming goods, is not exact, or otherwise inapplicable due to special reasons. See also Eastman Kodak Co. v. Westway Motor Freight, Inc., 949 F.2d 317, 319 (10th Cir. 1991). In Crail, the Supreme Court held that the plaintiff coal dealer could not recover the market price of the 5,500 pounds of coal that was missing in a delivery, because plaintiff had not resold any of the coal, the shortage did not interfere with the maintenance of his usual stock, and he was able to purchase coal of like quality at a

wholesale price of less than half of the retail market price. The Court held that the lower "replacement cost" was the appropriate measure of damages because the plaintiff's loss of coal could be remedied at wholesale market price without added expense. Crail, 281 U.S. at 63.

Although case law does not preclude an award of replacement costs, it likewise does not mandate such an award. The overriding purpose of the Carmack Amendment is to establish a uniform system of carrier liability that provides certainty to both shippers and carriers by enabling the carriers to assess their risks and predict their potential liability for damages. See generally Hughes v. United Van Lines, Inc., 829 F.2d 1407 (7th Cir.1987), cert. denied, 485 U.S. 913 (1988). From this perspective, the Carmack Amendment provides protection for both an injured plaintiff, and for a carrier that might otherwise face unforeseeably large losses. Hector Martinez, 606 F.2d at 109 (award of full compensation for all of the plaintiff's losses in Carmack Amendment case, including unforeseeable or bizarre losses, would simply be unfair to defendant carrier, as well as possibly paralyzing to commerce).

Here, Plaintiff is not entitled, as a matter of law, to $819,000, the cost to replace the boring mill. Plaintiff is not entitled to speculative estimates that are based on replacement of the damaged boring mill with one that is newer and different from the one it purchased. That fact distinguishes the instant case from Sutherland v. Ringsby Truck Lines, Inc., 549 P.2d 784 (1976). In Sutherland, the Plaintiff purchased multiple pieces of machinery at an auction for $15.00. After the machinery was destroyed during delivery, the plaintiff submitted evidence that the goods could have been purchased for a total of $22,000, and argued that the represented the actual replacement cost and market value. The court agreed.

Nor is the situation here analogous to Camar Corp v. Preston Trucking Co., Inc., 18 F.Supp.2d 112 (D. Mass 1998) aff'd 221 F.3d 271 (2000), a case advanced by EMS as support that the purchase price accurately reflects Plaintiff's damages. In Camar, the court determined that the shipper was entitled to damages for the loss of used naval equipment in the amount of the purchase price, despite evidence that similar equipment had been sold for substantial profit in the past. The Court reasoned:

8

> Buyers of such surplus property know perfectly well that there is always a chance of buying property that may turn out to be of little value, or may develop into a great bargain with a huge windfall of profit. It would amount to pure speculation on the part of a jury to determine where along the continuum bounded by those two extremes lay the value of the equipment in question.

Id. Plaintiff's purchase was not for the purpose of resale. It intended to use the boring mill in its business. Hence, neither Sutherland, nor Camar governs the analysis. Although Plaintiff is entitled to the benefit of its bargain, market value is a better measure of damages than the measures suggested by the parties. Accordingly, the Court rejects EMS' contention that if Plaintiff is to be restored to its original position, damages should not exceed the purchase price of $250,000, less salvage and other expenses. It also rejects Plaintiff's contention that it is entitled to the amount needed to purchase a new mill. Rather, Plaintiff is entitled to the market value of the boring mill at the time of delivery, and neither party has offered undisputed proof in that regard. The authorities cited by the parties establish that departure from the traditional market value rule for determining damages has been permitted when special reasons exist that render market value an unjust measure of actual damages. Neither party met its burden to show as a matter of law that special reasons warrant another calculation of damages.

Finally, the Court addresses the availability of the additional damages sought by Plaintiff; specifically, Plaintiff's request for $75,816 in lost profits on its contract with International Machine Service, Inc. According to Plaintiff, because the goal of the Carmack Amendment is to restore the shipper to its original position, it should receive the consequential damages.

Generally, special damages, such as lost profits are not recoverable, absent notice to the carrier of the special circumstances from which such damages would flow. See Contempo Metal Furn., Etc. v. East Tex. Mtr., Etc., 661 F.2d 761, 765 (9th Cir. 1981) (special damages are those that the carrier did not have reason to foresee as ordinary, natural consequences of a breach of the contract of carriage when such contract was formed); Main Road Bakery v. Consolidated Freightways, 799 F.Supp. 26 (D.N.J. 1992); Hector Martinez & Co. v. Southern Pacific Transp., 606 F.2d 106 (5th Cir. 1979). When

damage is the proximate and usual consequence of the carrier's action, it is foreseeable. Hector Martinez, 606 F.2d at109.

The Court rejects Plaintiff's position that EMS' extensive experience in the equipment transport industry creates an inference that EMS was aware that the boring mill would be used in future operations, and that delay would incur expenses in acquiring a substitute boring mill. The Court agrees with EMS that the facts of this case do not support Plaintiff's request. EMS never even had contact with Delta until after the accident and certainly had no knowledge as to the use that Delta would make of the boring mill. Delta's argument is grounded in sheer speculation and cannot substantiate an award of summary judgment. Accordingly, the Court denies both parties' request for summary judgment on damages. Plaintiff is entitled to the market value of the boring mill at the time of delivery and genuine issues of material fact as to what that amount is render summary judgment inappropriate.

**V. CONCLUSION**

For the reasons discussed above, the Court GRANTS Plaintiff's request for summary judgment as to the liability of EMS, and DENIES summary judgment as to its request for replacement value in the amount of $819,000 and lost profits. The Court GRANTS EMS' requests for summary judgment on Count II and DENIES its request for summary judgment on the public authority exception to liability and damages.

IT IS SO ORDERED.

                                  s/Marianne O. Battani
                                    MARIANNE O. BATTANI
                               UNITED STATES DISTRICT JUDGE

Dated: August 16, 2005

**CERTIFICATE OF SERVICE**

Copies of this Order were served upon Robert P. Anderson, Kurt D. Meyer and Jerry

R. Swift on this date by ordinary mail and/or electronic filing.

s/Bernadette M. Thebolt

Deputy Clerk
